**AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY & Bart McQueary, Plaintiffs,**

v.

**MERCER COUNTY, KENTUCKY & Charles H. McGinnis, Defendants.**

**No. Civ.A. 01–480–KSF.**

United States District Court, E.D. Kentucky, Lexington.

Sept. 6, 2002.

Everett C. Hoffman, Segal, Stewart, Cutler, Lindsay, Janes & Berry, PLLC, David A. Friedman, American Civil Liberties Union of Kentucky, Caroline L. Laurie Griffith, Louisville, KY, for plaintiffs.

Mathew D. Staver, Erik W. Stanley, Liberty Counsel, Longwood, FL, Francis J. Manion, American Center for Law & Justice, New Hope, KY, for defendants.

## OPINION & ORDER

FORESTER, Chief Judge.

This matter is before the Court upon the following motions: plaintiffs' motion for a preliminary injunction [DE # 2] and defendants' motion for summary judgment [DE # 6]. These motions are ripe for review. The Court heard oral argument on the above motions August 22, 2002, at which time the parties were given the opportunity to present testimony. Neither the plaintiffs nor the defendants presented testimony. The Court rendered a summary opinion from the Bench on August 22, 2002, based upon the briefs submitted and the oral argument. This written Opinion elaborates upon the August 22 decision, providing more extensive analysis of the Court's reasoning.

### FINDINGS OF FACT

The plaintiffs, both Mercer County resident Bart McQueary and the American Civil Liberties Union (hereinafter "ACLU"), seek declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that a display in the Mercer County Courthouse violates the Establishment Clause of the First Amendment. The plaintiffs request a declaration that the display is unconstitutional and request the Court to issue both preliminary and permanent injunctions against the display. Both Mercer County, Kentucky, and Charles H. McGinnis, in his official capacity as Mercer County Judge Executive, are defendants.

The plaintiffs allege that displayed on a wall of the Mercer County courthouse is a framed copy of one version of the Ten Commandments that is not part of any larger educational or comparative religion display. The ACLU further states that its Mercer County members use the courthouse to transact civic business and that each plaintiff believes in the separation of church and state and the freedom of religion and is offended by the display.

In October, 2001, the Mercer Fiscal Court gave permission to Mr. Carroll Rousey, a county resident, to hang a display entitled "Foundations of American Law and Government" in the County Courthouse. McGinnis Affidavit, ¶ 13. This display was paid for, framed, and hung by Mr. Rousey. Id. at ¶ 4. Rousey informed the Fiscal Court that the Kentucky General Assembly had recently passed a resolution authorizing the inclusion of the Ten Commandments in displays of formative, historical documents on government property. Id. at ¶ 5. The display includes: the Mayflower Compact; the Declaration of Independence; the Ten Commandments; the Magna Carta (in two frames); the Star Spangled Banner; the National Motto "In God We Trust;" the Preamble to the Kentucky Constitution; the Bill of Rights; and Lady Justice. Id. at ¶ 15.

The display also includes a commentary page explaining the historical significance of each of the nine items contained therein. Id. at ¶ 3. The explanation for the Ten Commandments is as follows:

> The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." The Ten Commandments provide the moral background of the Declaration of Independence and the foundation of our legal tradition.

Id. at ¶ 3.

As the photos attached to the McGinnis affidavit indicate, each frame in the display

is the same size and no one item is displayed more prominently than the other.

The Mercer Fiscal Court gave permission for the display as part of its authority over the decoration of public property owned by the County. *Id.* at ¶ 7. The stated purpose for the display is that "all of the documents, including the Ten Commandments, have played a role in the formation of our system of law and government." *Id.* at ¶ 7 (emphasis added). The Fiscal Court viewed the display as being consistent with the County's tradition of celebrating history, for example, as the first permanent settlement west of the Allegheny Mountains. *Id.* at ¶ 6. Judge McGinnis and the Fiscal Court specifically disclaim any intent to endorse or promote religion and reaffirm Mercer County's commitment to the free exercise of religion. *Id.* at ¶ 9.

## CONCLUSIONS OF LAW

### I. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

#### A. STANDING

##### 1. McQueary's injury in fact

■ As a preliminary matter, the defendants argue that plaintiff McQueary's alleged injury does not present a "case or controversy" sufficient to confer jurisdiction upon this Court pursuant to Article III of the Constitution. There are generally two views on the degree of alleged injury necessary to confer standing in the Establishment Clause context. The stricter view requires plaintiffs to allege altered behavior in an effort to avoid contact with a religious symbol. *See, e.g., Freedom From Religion Found. v. Zielke,* 845 F.2d 1463 (7th Cir.1988). The more lenient view taken by the Sixth Circuit does not require allegations that the plaintiff avoids contact with the display; instead, mere allegations by the plaintiff of direct and unwelcome personal contact with the religious symbol on government property are sufficient. *See, e.g., Hawley v. City of Cleveland,* 773 F.2d 736 (6th Cir.1985) *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986); *Washegesic v. Bloomingdale Public Schools,* 33 F.3d 679 (6th Cir.1994), *cert. denied,* 514 U.S. 1095, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995).

The defendants argue that the plaintiffs have alleged "boilerplate" standing and challenge whether McQueary or any other ACLU member has actually seen the display, relying on *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (rejecting standing where the plaintiff alleges no injury beyond the "psychological consequence presumably produced by observation of conduct with which one disagrees"). Here, it is undisputed that plaintiff McQueary will be directly and repeatedly subjected to an unwelcome Ten Commandments display located in the county courthouse, where he conducts civic business such as renewing driver's licenses and paying his taxes. *See* Verified Complaint, ¶¶ 13–14.

The defendants are correct that the Supreme Court has held "the Establishment Clause does not provide a special license [for plaintiffs] to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court. The federal courts were simply not constituted as ombudsmen of the general welfare." *Id.* at 487, 102 S.Ct. 752. However, this Court must follow the Sixth Circuit standing analysis as set forth above in *Hawley* and *Washegesic,* taking a more expansive approach than that explicitly recognized in *Valley Forge.* The defendants' attempt to distinguish the Sixth Circuit precedent by arguing that the plaintiff's contact here is remote and not as frequent as the plaintiff in *Washegesic* who

had "continuing direct contact with the object at issue." *Washegesic,* 33 F.3d at 683. However, McQueary has averred that he has routine contact with the local courthouse in order to conduct his civic business and this contact and reasonable likelihood of future contact constitutes sufficient injury in fact for standing pursuant to prevailing Sixth Circuit precedent.

### 2. ACLU's injury in fact

■ The ACLU has standing as an association as long as at least one of its members has standing. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members.... The association must allege that its members, *or any one of them,* are suffering immediate or threatened injury as a result of the challenged action.....") (citations omitted) (emphasis added).

It is undisputed that McQueary is an ACLU member living in Mercer County. As stated above, McQueary has alleged a sufficient injury in fact for standing. Consequently, the ACLU has standing derived from McQueary, its member.

### B. MERITS OF THE MOTION FOR PRELIMINARY INJUNCTION

At this stage, only the motion for preliminary injunction is before the Court. A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved. The Court must balance the four familiar factors when determining whether to issue a preliminary injunction in this Establishment Clause challenge: (1) the likelihood of success on the merits; (2) whether the plaintiff could suffer irrep-

arable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact the injunction will have on the public interest. *See, e.g., Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County, Tenn.,* 274 F.3d 377, 400 (6th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1952, 152 L.Ed.2d 855 (2002) (citing *Dixie Fuel Co. v. Comm'r of Social Sec.,* 171 F.3d 1052, 1059–60 (6th Cir.1999)); *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998) (citing *Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 653 (6th Cir.1996), *cert. denied,* 519 U.S. 807, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996)).

■ As both parties acknowledge, in a First Amendment case, "the likelihood of success on the merits frequently may be the determinative factor." *ACLU of Kentucky v. McCreary Co.,* 96 F.Supp.2d 679, 683 (E.D.Ky.2000)[1] (citing *Connection Distrib.,* 154 F.3d at 288). For the reasons explained below, the plaintiffs are unable to establish a "likelihood of success on the merits," and this factor determines that the plaintiffs' motion for preliminary injunction should be denied. However, it is important to emphasize that this ruling at the preliminary injunction stage does not necessarily bind the Court to rule similarly on the motion for a permanent injunction and declaratory judgment. *See, e.g., Six Clinics Holding Corp. v. Cafcomp Systems, Inc.,* 119 F.3d 393, 400 (6th Cir. 1997) (citation omitted).

■ Both parties acknowledge that the Supreme Court's *"Lemon* test" as set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), applies. Pursuant to the *Lemon* test, a government

---

1. For purposes of this opinion, the Court will analyze and cite interchangeably *American Civil Liberties Union of Kentucky v. McCreary Co.,* 96 F.Supp.2d 679, 683 (E.D.Ky.2000) *("McCreary I")* and *American Civil Liberties Union of Kentucky v. McCreary Co.,* 145 F.Supp.2d 845 (E.D.Ky.2001) *("McCreary II").*

action does not offend the Establishment Clause if it (1) has a secular purpose; (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement with religion. *Id.* at 612–13, 91 S.Ct. 2105. At the outset, the Court does not have to devote attention to the third prong of the test, as the plaintiffs have not argued this in seeking the injunction. The plaintiffs are unable to allege an excessive entanglement in part because it is undisputed that a private person (Carroll Rousey) donated the display, paid for it with his own funds and has agreed to the upkeep of the display. Therefore, the Court's focus is directed to only the first two prongs of the *Lemon* test. Of course, if the plaintiffs establish a violation of either prong one or two of the *Lemon* test, then the display is unconstitutional. *See, e.g., Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

Before applying the *Lemon* test, it is important to understand that since *Lemon* was decided, the Court has modified the second prong to include Justice O'Connor's "endorsement test." This endorsement test was first crafted in Justice O'Connor's concurrence in *Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), in which Justice O'Connor found clearly erroneous the district court's holding that "the city's use of an unarguably religious symbol 'raises an inference' of intent to endorse." *Id.* at 691, 104 S.Ct. 1355 (O'Connor, J., concurring). *Lynch* upheld the city's use of a creche (an undisputedly purely religious symbol) against an Establishment Clause challenge. *Id.* at 681, 104 S.Ct. 1355.

The Supreme Court soon adopted Justice O'Connor's endorsement test as the law of the land in *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). *Allegheny* shows that the en-

dorsement test, as well as the entire *Lemon* test, is fact-specific and that the context of the religious display is the key in determining constitutionality. *Allegheny* involved two religious displays in the Pittsburgh courthouse: a creche and a menorah. The *Allegheny* court struck down the creche display as unconstitutional, in large part because it was the property of the Holy Name Society, a religious group, and the sign prominently displayed in front of the creche read: "This Display Donated by the Holy Name Society." *Id.* at 580, 109 S.Ct. 3086.

In contrast, *Allegheny* upheld a display of a menorah and Christmas tree sitting in front of Pittsburgh city offices. In front of the Christmas tree and the menorah was a sign reading "salute to liberty." *Id.* at 582, 109 S.Ct. 3086. While it is undisputed that Christmas has secular applications, the question was whether the menorah was exclusively religious. The Court did not deny the strong religious nature of the menorah: "The menorah, one must recognize, is a religious symbol: it serves to commemorate the miracle of the oil as described in the Talmud. But the menorah's message is not *exclusively* religious." *Id.* at 613, 109 S.Ct. 3086 (emphasis added). The Court made clear that despite the undisputed strong religious nature of the Chanukah menorah, Pittsburgh did not violate the endorsement test because:

> ... it is not *'sufficiently likely'* that residents of Pittsburgh will perceive the *combined display* of the tree, the sign, and the menorah as an *'endorsement'* or *'disapproval of their individual choices ...'* the constitutionality of its effect must also be judged according to the standard of a *reasonable observer.*

*Id.* at 620, 109 S.Ct. 3086 (citations omitted) (emphasis added).

Justice O'Connor has further defined the "reasonable observer" for the endorsement test as an individual who is "deemed aware

of the history and context of the community and forum in which the religious display appears" *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 778–80, 115 S.Ct. 2440, 132 L.Ed.2d 650 (O'Connor, J., concurring). According to Justice O'Connor, it is important to understand that "there is always someone who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion, but that 'someone' does not constitute the 'reasonable observer' for purposes of the endorsement test." *Id.*

■ With the above background of the *Lemon* Test in mind, the Court turns to the specifics of applying the test to the facts of the case at bar and analyzing the applicability of the Supreme Court's one Ten Commandments case and the lower courts' developing patchwork quilt of Ten Commandments decisions.

### 1. Whether the display has a secular purpose

As a starting point, the plaintiffs acknowledge that they have the burden to show that the display was motivated by a religious purpose. *See* plaintiffs' brief in support of preliminary injunction, p. 5. Only when the government's religious purpose is *clear* has the Supreme Court struck down the government action on Establishment Clause grounds. *See, e.g., Aguillard,* 482 U.S. at 585, 107 S.Ct. 2573 (striking Louisiana's creationism statute); *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (striking mandatory daily reading of Bible verses and the Lord's Prayer in public schools); *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). It is important to keep in mind that the only "burden" on the government is to offer a valid secular purpose for the display. The Court is "normally deferential" to the "articulation of a

secular purpose" so long as it is "sincere and not a sham." *Aguillard,* 482 U.S. at 586–87, 107 S.Ct. 2573 (citations omitted); *Cohen v. City of Des Plaines,* 8 F.3d 484, 489 (7th Cir.1993). Courts are "reluctan[t] to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute." *Cohen,* 8 F.3d at 489–90 (quoting *Mueller v. Allen,* 463 U.S. 388, 394–95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983)). In essence, the plaintiffs must show that the stated valid secular purpose is a "sham" and that the purpose behind the display was "wholly" motivated by religious considerations. *See Santa Fe Ind. Sch. Dist. v. Doe,* 530 U.S. 290, 307, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); *Bridenbaugh v. O'Bannon,* 185 F.3d 796, 800 (7th Cir.1999); *Barghout v. Bureau of Kosher Meat & Food Control,* 66 F.3d 1337, 1345 (4th Cir.1995) ("In determining whether the [display] has a secular purpose, we note that this first prong of the *Lemon* test is a fairly low hurdle. A legislative enactment has no secular purpose only if 'there [is] no question that the [display] or activity was motivated wholly by religious consideration.'" (quoting *Lynch,* 465 U.S. at 680, 104 S.Ct. 1355)).

Here, the defendants have stated a secular purpose for the display, namely, "all of the documents, including the Ten Commandments, have played *a* role in the formation of our system of law and government." McGinnis affidavit, ¶ 7 (emphasis added). Further, the explanatory text displayed along with the frames explains the historical significance of the displayed items and refers to the Ten Commandments as follows: "The Ten Commandments have profoundly influenced the formation of western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that, 'We hold these truths to be self-evident, that all men are created equal, that they are endowed

by their Creator with certain unalienable Rights, that among these are life, liberty and the pursuit of happiness.' "

The plaintiffs believe that the Ten Commandments are only a sacred, religious document, and that the Commandments cannot be described as a unique foundational document for American law in general. *See* Plaintiffs' brief in support of preliminary injunction, pp. 18–19. The plaintiffs may wish as a normative matter that our common law was not influenced by the Ten Commandments, but neither their wishes nor any court of law may change history. *Cf. Wallace*, 472 U.S. at 99, 105 S.Ct. 2479 (Rehnquist, J., dissenting). Indeed, the Supreme Court has stated: "[t]he history of man is inseparable from the history of religion." *See Engel v. Vitale*, 370 U.S. 421, 434, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Legal proof that the Ten Commandments do indeed have secular, historical significance comes from the Supreme Court itself in *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) and other cases, as well as the lower courts. According to Justice Frankfurter, "Innumerable civil regulations enforce conduct which harmonizes with religious concerns. State prohibition of murder, theft and adultery reinforce commands of the decalogue." *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). According to Chief Justice Rehnquist, the Ten Commandments, undeniably, "have had a significant impact on the development of secular legal codes of the Western World." *Stone v. Graham*, 449 U.S. at 45, 101 S.Ct. 192 (Rehnquist, J., dissenting); *see also Lynch*, 465 U.S. at 677, 104 S.Ct. 1355 (upholding the presence of the depiction of Moses and the Ten Commandments on the Supreme Court's wall). As for lower courts, the Tenth Circuit has held that the Commandments are "historically important ... with *both* secular and sectarian effects." *Anderson v. Salt Lake City Corporation*, 475 F.2d 29, 34 (10th Cir.1973) *cert. denied*, 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973) (emphasis added).

The only other Circuit to squarely address the Ten Commandments also clearly acknowledged its secular aspects, even though the Court held that the context and particular circumstances of the display in that case was overly religious in nature. "[T]he text of the Ten Commandments no doubt has played a role in the secular development of our society and can no doubt be presented by the government as playing such a role in our civic order." *Books v. Elkhart*, 235 F.3d at 292 (7th Cir.2000), *cert. denied*, 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001). Numerous other courts acknowledge the secular nature of the Ten Commandments. *See, e.g., Summum v. City of Ogden*, 152 F.Supp.2d 1286 (D.Utah 2001); *Christian v. City of Grand Junction*, No. 01–D–685 (D.Colo. June 27, 2001); *State v. Freedom From Religion Found.*, 898 P.2d 1013 (Colo.1995), *cert. denied*, 516 U.S. 1111, 116 S.Ct. 909, 133 L.Ed.2d 841 (1996).

The above cases merely state what any sober student of history knows: for good or bad, right or wrong, the Ten Commandments *did* have an influence upon the development of United States law and it can be constitutional to display the Ten Commandments in the appropriate context. The first prong of the *Lemon* test merely requires that the government act with *a* secular purpose. The law distinguishes between a religious purpose (which is impermissibly normative) and a secular purpose for the display, such as acknowledging history.[2] The Court is obviously

2. The Court notes the textbook "black or white" fallacy inherent in the plaintiffs' argument that the religious or sacred nature of the decalogue forecloses a finding of a secular purpose for the display. The genesis of this

not required to determine whether the secular purpose is morally or politically correct—because the government acts neutrally so long as the purpose is one other than advancing religion. *See, e.g., Rosenberger v. Rector and Visitors of Univ. of Virginia,* 515 U.S. 819, 839–40, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). However, the plaintiffs dispute the Ten Commandments' secular nature and further challenge the influence of the Commandments on the development of our laws. Apparently, the plaintiffs argue that the Commandments lack a secular nature, and instead have an overwhelmingly religious nature; thus, any articulated secular purpose for the display must be a sham. As stated above, the secular purpose of acknowledging the Commandments' influence on our laws is not a sham because such a purpose has historic support and there is an absence of evidence indicating that the stated reasons for the display constitute a sham.

In direct opposition to the clear authority above, holding that the Ten Command-

ments do have a secular nature and can be constitutionally displayed, the plaintiffs extrapolate language from *Stone* and *McCreary* to argue that the defendants cannot have a secular purpose for displaying the Commandments. As an initial matter, it is important to understand that *Stone* itself does not even imply that the Ten Commandments may never be displayed by the government. Instead, *Stone* states that the Ten Commandments could even be used and studied in school, despite the fact that, as plaintiffs acknowledge, religious displays in the school setting always receive stricter scrutiny by the Supreme Court because of the coercive power of the state over impressionable children compelled to attend school because of mandatory attendance requirements. The fact that *Stone* involved the school context, as opposed to a setting without the compelled attendance of young children, was the key factor determining that decision. The plaintiffs' argument fails to account for the fact that, according to Justice Brennan, "[t]his distinction warrants a difference in constitutional re-

argument is the infamous "wall of separation" metaphor; however, here, the plaintiffs attempt to take the almost universally discredited "wall" metaphor to new heights. The plaintiffs' reasoning supports, in terms of metaphors, an overly simplistic constitutional scheme of classification in which items from the constitutionally radioactive "City of God" must be forever separated from the secular "City of Man" by an artificially constructed "wall." *Cf.* St. Augustine, Bishop Of Hippo, The City Of God (Marcus Dods ed. and trans. 1948). As stated by Chief Justice Rehnquist, and originally by Justice Cardozo, "[m]etaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Wallace,* 472 U.S. at 107, 105 S.Ct. 2479 (Rehnquist, J., dissenting) (quoting *Berkey v. Third Avenue R. Co.,* 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926)).

Relegating aside any merits of Augustine's rigid line of demarcation between the sacred and secular from a *religious* perspective, modern establishment clause jurisprudence, from

a *secular* perspective soundly rejects such discrete demarcation of the religious and secular. "Candor compels acknowledgment ... that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. The mere fact that the Ten Commandments refer to God, and that all of the world's major monotheistic religions seemingly have the Ten Commandments as basic tenets of faith does not forever impale Mercer County's legitimate secular purpose for the display. *See, e.g., Books,* 235 F.3d at 313 (Manion, J., concurring in part and dissenting in part) (citing *American Jewish Congress,* 827 F.2d at 126) (stating that to serve a secular purpose, the government's purpose need not be unrelated to religion); *Cf. Bridenbaugh v. O'Bannon,* 185 F.3d 796, 799–800 (7th Cir.1999) (indicating the fact that a secular holiday coincides with a day that has religious significance for Christians does not defeat the secular purpose justifying the state holiday).

sults." *School Dist. of Abington v. Schempp,* 374 U.S. 203, 252–53, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); *see also Lee v. Weisman,* 505 U.S. 577, 592, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressures in schools."); *Aguillard,* 482 U.S. 578, 583–84, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools."); *Wallace v. Jaffree,* 472 U.S. 38, 60 n. 51, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). *Stone* makes clear, even in context of a public school classroom, which receives stricter scrutiny than a courthouse or other government property, that the Ten Commandments may be used as part of "an appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone,* 449 U.S. at 42, 101 S.Ct. 192 (citation omitted).

Aside from the fact that *Stone* does not explicitly or implicitly extend to non-school settings, at this stage of the litigation, the plaintiffs simply do not have any direct evidence that the proffered government intention for the display is a sham. Therefore, the plaintiffs rely entirely upon an inference in their effort to show that the display does not have a secular purpose. Since the current case is devoid of actual evidence of a sham intent, plaintiffs' attempt to extend *Stone* far beyond its fair reading, particularly in light of its facts and subsequent Supreme Court case law explaining *Stone.* Contrary to the effort to extend *Stone,* the plaintiffs' brief actually acknowledges that the Supreme Court did not establish a categorical, absolute, *per se* rule that any government display of the Ten Commandments violates the Establishment Clause. However, despite the clear language of *Stone,* the plaintiffs argue, [T]he Supreme Court's discussion of the purpose prong in *Stone* makes it nearly impossible for Mercer County to identify a valid secular purpose. *See* Plaintiffs' brief in support of preliminary injunction, p. 6. The plaintiffs then extrapolate a quote from *Stone* taken out of context. The plaintiffs' entire argument that Mercer County violates the first prong of *Lemon* is based on this language from *Stone:* "The pre-eminent purpose for posting the Ten Commandments ... is plainly religious in nature" and "no legislative recitation of a supposed secular purpose can blind us to that fact." *Stone,* 449 U.S. at 41, 101 S.Ct. 192. The context in which this statement was made and subsequent Supreme Court cases have explained that this language from *Stone* did not purport to establish a firm rule of law categorically invalidating government displays of Ten Commandments.

Even the plaintiffs' conception of *Stone* most deferential to the government, *i.e.,* that it is "nearly impossible" for the government to ever display the Ten Commandments, is not the law. If it were, then the flood of Ten Commandments litigation currently in the federal courts would be summarily resolved in favor of the plaintiffs. Instead, numerous cases have upheld the Ten Commandments displays, *in the proper context.* As proof that the plaintiffs' broad reading of *Stone* is folly, it is first necessary to look to later clarification by the Supreme Court. Justice Brennan, by all accounts a general advocate of the "wall of separation" policy, forthrightly acknowledged seven years after the *Stone* decision that the case "did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization." *Edwards v. Aguillard,* 482 U.S. 578, 593–4, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (citing *Stone,* 449 U.S. at 42, 101

S.Ct. 192). The language from *Edwards* alone is sufficient for this Court to reject the plaintiffs' argument that the mere fact that the Ten Commandments have a religious nature to some renders any government display of the Commandments unconstitutional. The holding of *Stone* is simply not that broad.

To be sure, even if one does not accept Justice Brennan's view of *Stone*, the fact that *Stone* has not overruled *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir.1973), a Tenth Circuit Case which upheld a courthouse display of the Ten Commandments, further proves that *Stone* only invalidated Ten Commandment displays in certain contexts. *Anderson* upheld a permanent Ten Commandments display on courthouse grounds seven years prior to *Stone* and the *Stone* decision was so grounded in the school context that the Court did not find it necessary to cite, distinguish, or overrule the case. *Stone* quite simply invalidated Kentucky's statute requiring the posting of the Ten Commandments in public schools for two reasons neither of which are present in this case: (1) the school *setting,* in which the Court clearly applies stricter scrutiny, and (2) the finding by the Supreme Court that the Commandments were not posted as an historical display or integrated into the curriculum, but were instead posted *alone,* *"purely as a religious admonition."* *Lynch,* 465 U.S. 668, 679, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (emphasis added). The Supreme Court clearly found that the intent of the Kentucky government officials posting the Commandments was for the students to see the Commandments on the wall and learn and obey the Commandments like the alphabet. Of course, the case at bar does not involve a school setting, and the Commandments are posted in the context of a display with nine other historical documents, not alone as in *Stone* or *McCreary.* Here, unlike in the captive school setting in *Stone,* no one is required to read or recite the Ten Commandments; instead, an offended observer can easily avert his or her eyes from the offensive decalogue, merely one of nine other equally sized items in the government display. *See, e.g., Anderson* 475 F.2d at 33 (citing *Cohen v. State of California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)).

Finally, the unique factual circumstances dictating the result in *McCreary* are simply not present in this case. As Judge Coffman indicated, that decision was based upon the fact that the particular history of the lawsuit allowed the court to deduce an impermissible intent on the part of the government officials to promote the religious nature of the Ten Commandments, as opposed to the secular nature of the Commandments. *McCreary,* 96 F.Supp.2d at 687. The defendants in *McCreary* initially displayed only the Ten Commandments with no other items in the display. *Id.* at 683. Then, after suit was filed, the defendants added certain historical documents to the Ten Commandments display in an attempt to bring their actions in compliance with the First Amendment. *Id.* However, the full text of these documents were edited by the defendants to display only text referencing religion and/or Christianity. *Id.* According to Judge Coffman, this "history" of the litigation was sufficient to show defiance of the law and court orders on the part of the government, making clear the defendants' religious intent for the display. *McCreary,* 145 F.Supp.2d at 850.

Clearly, the Mercer County display is not tainted with any prior history of defying *Stone* or any other binding authority, as the Commandments were displayed in a proper historical context *ab initio.* Unlike here, *McCreary* found that the government's stated secular purpose was contrary to the facts of the case because the historical documents were only added after the lawsuit was initiated. Finally, the

*McCreary* court rejected the government's third and fourth attempt to display the Commandments, based upon the totality of the circumstances, due to the "above history of the government's involvement in these displays." *Id.* at 850.

*McCreary* stated "that case [Stone] established that a state's desire to proclaim the Ten Commandments' foundational value for American law and government is a religious, rather than a secular, purpose." Obviously, this language may not expand the holding of *Stone* by serving as a *per se* rule, invalidating all secular uses of the Ten Commandments by government. *Stone* simply held that the particular government before that Court (the Commonwealth of Kentucky) had an impermissible religious, as opposed to secular, motive for the Commandments display. There is no basis in law or fact to impute the "constitutional sins" committed by the Commonwealth of Kentucky, as determined by *Stone* in 1980, to Mercer County over two decades later. The plaintiffs argue, "The only reasonable inference is that Mercer County had a primarily religious purpose in posting this display." As set forth above, the facts simply do not support such an inference. Likewise, there is no basis in law or fact to impute the motives of McCreary, Pulaski, and Harlan Counties (or the unconstitutional motives of any other government entity displaying the Commandments) to Mercer County. *See, e.g.*, *Allegheny*, 492 U.S. at 595, 109 S.Ct. 3086 ("[e]very government practice must be judged in its unique circumstances. . . ."). Judge McKinley recognized that the unconstitutional motives of one county may not be imputed to another county in the *Grayson County* case:

> "At this stage of the litigation, the plaintiffs have presented no evidence concerning the history of this particular display that would indicate that the Defendants' articulated purpose is religious in nature. Therefore, with no informa-

tion to the contrary, the Court will defer to the Defendants' stated purpose for the display based on the record at this preliminary stage of the litigation. . . ."

*ACLU v. Grayson County*, Civ.Act. No. 4:01–cv–202–M, 2002 WL 1558688, *4 (2002).

For the above reasons, this Court adopts the reasoning of a recent federal district court case from Tennessee disagreeing with the reasoning in *McCreary* and *Grayson*. According to Judge Echols:

> [t]his Court . . . believes that a display of documents, including the Ten Commandments, may be constitutional if properly selected, exhibited, and posted with a true educational motive. Accordingly, the Court respectfully disagrees with the reasoning set forth in *McCreary II* and adopted in *Grayson County*.

*ACLU v. Rutherford County, Tennessee*, 209 F.Supp.2d 799, 810 (M.D.Tenn.2002).

In sum, the defendants' stated purpose of acknowledging the historical influence of the Commandments on our law is a sufficient secular purpose. The historical evidence and case law outlined above overwhelmingly holds that the Ten Commandments are not exclusively religious and can be included in government displays in the proper context. The plaintiffs' interpretation of *Stone* as precluding the government from acknowledging the historical influence of the Commandments is erroneous based upon the language of *Stone* itself and subsequent Supreme Court cases.

The defendants have offered a proper secular purpose for the display, that of acknowledging history and the role of the Commandments in the development of American law. The Supreme Court acknowledges the secular influence of the Commandments and a government may choose to acknowledge this historical influence as a proper secular purpose for the

display. Previous cases have upheld similar displays of the Ten Commandments posted with the secular intent of acknowledging the historical influence of the Commandments on the development of this country's laws. *See, e.g., Anderson v. Salt Lake City,* 475 F.2d 29 (10th Cir.) *cert. denied,* 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973); *Books v. City of Elkhart, Indiana,* No. 3:98cv0230 AS (N.D.Ind. March 4, 2002); *Summum v. City of Ogden,* 152 F.Supp.2d 1286 (D.Utah 2001); *Suhre v. Haywood Cty.,* 55 F.Supp.2d 384 (W.D.N.C.1999); *Christian v. City of Grand Junction,* Civil Action No. 01–D–g85, U.S.Dist.Ct.Colo. (unpublished opinion); *State of Colorado v. Freedom From Religion Found., Inc.,* 898 P.2d 1013 (Colo.1995), *cert. denied,* 516 U.S. 1111, 116 S.Ct. 909, 133 L.Ed.2d 841 (1996).

Finally, the facts of *McCreary* are far removed from this case in that the *McCreary* defendants displayed only the Ten Commandments, without any other context, and the history of that litigation revealed a non-secular religious purpose of promoting Christianity. The plaintiffs are without question unable to show that the challenged display is *"entirely* motivated by a purpose to advance religion" at this stage and thus there is no violation of the first prong of the *Lemon* test. *See Wallace,* 472 U.S. at 56, 105 S.Ct. 2479; *McCreary,* 96 F.Supp.2d at 687.

## 2. Whether the primary purpose or effect of the display is to endorse religion

■ The "primary effect" prong of the *Lemon* test requires the Court to "assess[ ] the totality of the circumstances surrounding the display to determine whether a reasonable observer would believe that the display amounts to an endorsement of religion." *Books,* 235 F.3d

at 304 (citing *Allegheny,* 492 U.S. at 597, 109 S.Ct. 3086). The Sixth Circuit has found the endorsement test to be a refinement of the "effects" aspect of the *Lemon* test. *See Granzeier v. Middleton,* 173 F.3d 568, 573 (6th Cir.1999). The second prong of *Lemon* is violated only when the context of the government action sends an *"unmistakable message"* of government support for, or endorsement of, religion. *Allegheny,* 492 U.S. at 598–600, 109 S.Ct. 3086; *Lynch* 465 U.S. at 680, 104 S.Ct. 1355.

An *en banc* Sixth Circuit recently stated that the mere fact that a governmental action does not have an exclusively secular purpose does not mean that the action violates the *Lemon* test. *American Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd.,* 243 F.3d 289, 308 (2001). *Capitol Square* further quoted *Lynch,* "Were the test that the government must have 'exclusively secular' objectives, as the Supreme Court noted in *Lynch v. Donnelly,* 465 U.S. at 681 n. 6, 104 S.Ct. 1355, much of the conduct and legislation this Court has approved in the past would have been invalidated." *Id.*

The plaintiffs devote several pages of their brief arguing that the Ten Commandments are indeed religious text for certain believers. The defendants do not dispute this fact. The question before the Court is obviously not whether the Ten Commandments are a religious text, but whether the primary effect of the display containing the Commandments endorses religion in the mind of the reasonable observer. The reasonable observer is held to be capable of distinguishing the religious and secular nature of the Commandments. Endorsement of religion is a normative concept; whereas acknowledgment of religion is not necessarily a value-laden concept.[3]

---

3. *See supra,* note 1. The Plaintiffs fall prey to      the logical fallacy generally known as the

Two Kentucky district courts within the Sixth Circuit have determined that displays similar to the one at bar violate the second prong of *Lemon.* See *ACLU of Ky. v. Grayson County,* No. 4:01cv202, 2002 WL 1558688 (W.D.Ky. May 15, 2002); *McCreary* 145 F.Supp.2d 845. Critical to Judge Coffman's endorsement determination, rendered in dicta, was the conclusion that "[t]he history of these displays bolsters the reasonable observer's perception of the state endorsement of religion. The reasonable observer viewing these displays would know of the defendants' previous attempts to post the Ten Commandments alone and unsurrounded by religious excerpts from historical documents." *McCreary,* 145 F.Supp.2d at 852.

Of course, this history is not present in the case at bar. Likewise, the reasonable observer would quite simply be aware of the absence of Mercer County's attempt to post the Ten Commandments alone. Moreover, according to the *McCreary* analysis, the reasonable observer would be aware of the history of this litigation, in which Mercer County officials specifically disclaim any intent to promote religion and reaffirm their commitment to the Free Exercise of religion.

Aside from the history of the display and litigation rendering the context impermissibly religious, the endorsement analysis in *McCreary* was based to an unknown degree on the conclusion that historical documents placed alongside the Ten Commandments, without any other religious symbols, accentuate the religious nature of the Commandments and sends an unmistakable message to the reasonable observer that the county is endorsing religion. The plaintiffs' attempt to extend this analysis to a context lacking the tainted intent found in *McCreary* would mean, for all practical purposes, that a government with a legitimate secular purpose would be "constitutionally damned" by displaying the Commandments in a context containing other secular items that also influenced the development of American law and history. If the Commandments are displayed alone, the Court would find that this constituted a clear endorsement of religion. However, if the Commandments are displayed with other historical and political documents that similarly influenced the

argument of the beard, as they are unable, or perhaps unwilling, to distinguish the admittedly close concepts of endorsement versus acknowledgment. The fact that it is difficult to distinguish acknowledgment and endorsement does not impale the legitimacy of the line drawn between the concepts as explained by the Supreme Court in such cases as *Lynch* and *Allegheny.* The plaintiffs' summary dismissal of *Lynch* and *Allegheny* as inapplicable here, because those cases involve the "secularized" Christmas season, is gross oversimplification. The present *Lemon* test turns on the sometimes finite distinction between government policies permissibly tolerating or respecting religion (accommodation) as opposed to the impermissible endorsement of religion. *See, e.g., Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 779, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor J., concurring); *Chandler v. Siegelman,* 230 F.3d 1313, 1317 (11th Cir.2000).

This Court sympathizes with both parties' difficulty in determining the constitutional line of demarcation due to the absence of definitive case law on the subject. The emerging patchwork quilt of Ten Commandments cases gives credence to Chief Justice Rehnquist's view that the real problem is *Lemon* itself. *See, e.g., Wallace,* 472 U.S. at 112, 105 S.Ct. 2479 (1985) (Rehnquist, J., dissenting); *Allegheny,* 492 U.S. at 655–56, 109 S.Ct. 3086 (Kennedy, J., concurring in part, dissenting in part); *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 398, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., (joined by Thomas, J.) concurring). However, *Lemon* at present remains the law and the Court has faithfully attempted to engage in the subtle line-drawing between endorsement and acknowledgment as required by subsequent cases interpreting *Lemon.*

development of the common law, this would overly connect the Commandments with the secular government.

In this Court's opinion, neither the Constitution nor *Stone* impose such a would-be constitutional straightjacket or conundrum for governments legitimately wishing to display a document having great secular influence on the development of our laws, such as the Ten Commandments. Categorical hostility to a government display of the Commandments in the context of other historical documents would constitute "overzealous rigidity" emblematic of the extra-constitutional "wall of separation" political theory that is contrary to the Supreme Court's more recent pronouncements requiring the Establishment Clause to be interpreted within the framework of affirmative accommodation of religion in the public square.[4] *Cf. Anderson*, 475 F.2d at 32. As the defendants phrase it, there is no basis in the Constitution or in binding case law compelling the Court to

regard the Commandments as "constitutionally radioactive" material. More specifically, as the Supreme Court stated in an often overlooked passage from *Lemon* itself, reviewing the history of the Establishment Clause:

> [o]ur prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable.... Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.

*Lemon*, 403 U.S. at 614, 91 S.Ct. 2105 (citations omitted).

Based upon the above interpretive principles and the more specific analysis stated below, the Court disagrees with the analysis of *McCreary* and similar cases address-

4. "Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions and forbids hostility toward any." *Lynch,* 465 U.S. at 673, 104 S.Ct. 1355. The Supreme Court has stated that the proper interpretation of the Establishment Clause should "compor[t] with what history reveals was the contemporaneous understanding of its guarantees." *Lynch,* 465 U.S. at 673, 104 S.Ct. 1355.

Instead of comporting with history, the plaintiffs' brief reads as if the framers had enacted an Establishment Clause stating "Congress shall make no law *touching* upon religion" instead of "Congress shall make no law respecting the *establishment* of religion." Ironically, Representative Samuel Livermore argued during House debates that the Establishment Clause should prohibit laws "touching" upon religion by proposing the language "Congress shall make no laws touching religion or infringing the rights of conscience." 1 Annals of Cong. 434 (1789) Of course, Livermore's "touching" language was rejected in favor of the "establishment" language found

in the First Amendment. Chief Justice Rehnquist has stated that the contemporaneous understanding of the establishment clause "forbade establishment of a national religion, and forbade preference among religious sects or denominations." *Wallace*, 472 U.S. at 106, 105 S.Ct. 2479 (citing 1 N. Webster, American Dictionary of the English Language (1st ed. 1828)). Even if one wished to dispute the dictionary record of Noah Webster as to the contemporaneous meaning of "establishment" and the views of Chief Justice Rehnquist as to the contemporaneous understanding of the Establishment Clause, reasonable minds cannot dispute that the "touching" language would have provided constitutional mortar for the plaintiffs' wall theory, had that language not been rejected by the framers. According to three Supreme Court Justices, "Livermore's proposal would have forbidden laws having anything to do with religion and was thus not only far broader than Madison's version, but broader even than the scope of the Establishment Clause as we now understand it." 505 U.S. 577, 612–13, 112 S.Ct. 2649, 120 L.Ed.2d 467 (Souter, J., concurring, (joined by Stevens, J. and O'Connor, J.)).

ing the context of the display at bar and instead adopts reasoning similar to that set forth in the more recent cases of *Rutherford,* 209 F.Supp.2d. 799 and *Books v. City of Elkhart,* No. 3:98cv0230 AS (N.D.Ind. March 4, 2002) (on remand [5]) (both rejecting a finding that displays substantially similar to the one at bar send the unmistakable message of endorsement in the mind of the reasonable observer). As emphasized by *Rutherford,* language in *McCreary* and *Grayson* appears to be at odds with the Supreme Court's decisions in *Lynch* and *Allegheny,* both more recent than *Stone* and both taking a more tempered approach, reflecting an interpretation of the Establishment Clause that accommodates religion.

Of course, *Stone* is not at issue in the context of analyzing the endorsement test, because that case was decided by reference to the first prong of *Lemon,* and the endorsement test was not set forth by the Supreme Court until years later. In both *Lynch* and *Allegheny,* the Court considered the endorsement test in the context of government displays of symbols, a creche and menorah, with undisputed religious significance, like the Ten Commandments. In *Lynch,* the Court upheld the display of a creche, along with various secular items associated with Christmas, such as Santa Clause, a reindeer, a Christmas tree, carolers, etc. The Court held that in light of the overwhelming secular character of the display, "the inclusion of a single symbol of a particular historic religious event . . . [did not] so 'taint' the city's exhibit as to render it violative of the Establishment Clause." *Lynch,* 465 U.S. at 686, 104 S.Ct. 1355.

In *Allegheny,* the Court found that a creche displayed without other secular items to detract from the religious message violated the second prong of *Lemon. Allegheny,* 492 U.S. at 580–81, 109 S.Ct. 3086. Aside from the fact that the context of the display did not contain other secular items, the creche also contained a sign reading "This Display Donated by the Holy Name Society (a Catholic religious group)." *Id.* at 580, 109 S.Ct. 3086. In contrast, *Allegheny* upheld the display of a menorah in the same courthouse, displayed along with a Christmas tree, and a sign reading "Salute to Liberty." *Id.* at 598–99, 109 S.Ct. 3086. The Court found that the menorah display created an "overall holiday setting" consisting of both religious and secular symbols. *Id.* at 614, 109 S.Ct. 3086.

As a starting point in comparing *Lynch* and *Allegheny* to the facts of the display at bar, it is crucial to understand that *Lynch* involved the display of a creche—a solely religious symbol as determined by the Court. The text of the Ten Commandments, at the very least six of the Ten Commandments, have undisputed secular significance, as acknowledged by the plain-

---

**5.** In *Books,* the district court, on remand from the Seventh Circuit, approved a proposed display on a courthouse lawn containing the Ten Commandments, the Bill of Rights, the Declaration of Independence and the Preamble to the Constitution. Like the case at bar, the Ten Commandments and the secular monuments were all the same size and were financed by private citizens. The display contained explanatory documents virtually identical to those in Mercer County, indicating: "This display contains the texts of five historical documents fundamental to the development of the rule of law, modern democracy, and American Independence. The Ten Commandments are a cornerstone of American Law." Both the plaintiffs' counsel and defendants' counsel in *Books* (ironically the same legal organizations in the case at bar) agreed to this remedy and thus there will not be further appeals in that case. United States District Judge Allen Sharp stated that the display currently "represents a proper balance concerning all of the constitutional values that are involved in this case, and complies with the First Amendment. . . . Counsel are to be complimented on this effort."

tiffs. Thus, a reasonable observer, without considering context, would regard a display of solely the Ten Commandments as representing a lesser degree of endorsement of religion than the level of endorsement represented by a display of a sole creche. Accordingly, without considering context, there is initially a lesser burden involved in dispelling any perceived religious endorsement from the sole display of the Ten Commandments as opposed to the burden required to dispel any perceived religious endorsement from the sole display of a creche.

The above comparison illustrates the fact that *Lynch* and *Allegheny* teach that "context is everything" in determining whether a particular display violates the Establishment Clause under *Lemon*. *See Books*, 235 F.3d at 317 (Manion, J., concurring in part and dissenting in part). Mercer County is not obligated to minimize the religious aspect of the Ten Commandments; instead, the context of the display is the constitutional key—it is the message of possible government endorsement of religion that must be sufficiently minimized by the setting and context. *Id.* at 319 (citing *Lynch*, 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring) ("[A] typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content.")).

The context of the government display *in its entirety* and whether this context as a whole sends an objective message that endorses religion is the appropriate constitutional analysis. Thus, the Court rejects the plaintiffs' arguments that the Ten Commandants, as "sacred text," cannot be analyzed for endorsement purposes similarly to a creche, menorah or other religious symbol or item. *Cf. Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 776 (7th Cir.2001) (Coffey, J., dissenting), *cert. denied,* —— U.S. ——, 122 S.Ct. 1173, 152 L.Ed.2d 117.

If this Court were to engage in an analysis comparing the relative religiosity of the Ten Commandments and the creche (as the plaintiffs request), then this would first require a determination of whether the four commandments textually referring to religion, in *isolation* from the other six commandments textually referring to secular duties, are solely religious in nature and then a consideration whether these four commandments represent a greater degree of religiosity than the creche in *Lynch*. Likewise, if this above would-be isolation of the secular versus the religious nature of the challenged item were possible, then *Allegheny* and *Lynch* would have considered the depiction of the infant Jesus in isolation from the secular crib in the creche display. *Allegheny* and *Lynch* obviously did not undertake the constitutional analysis by considering the challenged item in isolation from its constituent parts or in isolation from the constituent parts of the entire display. As the Supreme Court has held, "[f]ocus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause." *Lynch*, 465 U.S. at 680, 104 S.Ct. 1355.

Of course, the Court must analyze the constitutionality of the challenged display not in isolation, but in the display's entirety. Moreover, when a particular challenged item has undisputed religious significance, neither this Court nor any other may accurately evaluate the degree of "sacredness" with which the item is held by religious groups or the public at large.[6] It

---

6. By analogy, the Supreme Court has stated, it is not within the judicial function and judicial competence to inquire whether the petitioner or [another member of his faith] more correctly perceived the commands of their common faith ... [i]nstead, a court may determine whether the litigants' asserted views have any basis whatsoever in the

is not the province of the Court to evaluate whether the Ten Commandments are "more strongly religious" than a creche or a menorah. Both the creche and the menorah at issue in *Lynch* and *Allegheny,* as well as the Ten Commandments at issue here, have genuine religious significance to some citizens. The difference is subtle, but the only constitutionally relevant analysis is whether the challenged display or practice is religious in nature and whether the government action based on the entire context sends the unmistakable message to a reasonable observer of endorsement of religion. The only constitutionally relevant "weighing" among Lynch, Allegheny and the case at bar is in regard to the relative degrees of secular context necessary to dispel a perceived endorsement of religion. Thus, the teaching of *Lynch* and *Allegheny* apply with full force to the Ten Commandments context.

Here, it is undisputed that the Ten Commandments, the only item challenged in the display, is in the form of an 8 1/2″ × 11″ paper copy, along with a display of eight other items of the same size, all representing texts or symbols of American law and government. The Commandments are not displayed in larger text or otherwise more prominently than the other items in the display, a key factor examined by the Seventh Circuit in evaluating endorsement. *Cf. O'Bannon,* 259 F.3d at 772. The courthouse display emphasizes the role of the Ten Commandments in secular, legal matters and the context of the several other secular items prevents a finding that the display is dominated by religion. The context and affidavit of Judge McGinnis convey that the Commandments are part of the city's celebration of its cultural and historical roots and not a promotion of

creed or community on which they purport to rest their claim.
*Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).

religious faith. The reasonable observer is charged with being aware of the unique historical significance of Mercer County and its County seat of Harrodsburg, dating back well into the 18th Century, as the oldest permanent settlement in Kentucky, and in fact the oldest permanent settlement west of the Allegheny Mountains.

Moreover, the explanatory documents accompanying the displayed items, explaining that the Ten Commandments had a role in the formation of western common law, are all factors that weigh strongly against finding that a reasonable observer would view the display as promoting any particular sect of religion or religion in general. The reasonable observer should recognize that the "common link" of the items or symbols in the display are documents that have all been influential in the formation of the American system of government. The Commandments are an almost universal and instantly recognizable symbol of the rule of law and are displayed in at least five locations in the United States Supreme Court building. Unlike in *McCreary,* it would be clearly unreasonable for an observer aware of both the totality of the display and the local and United States history, to conclude that religion was the common link of the displayed items. It would likewise be unreasonable for an observer to focus solely on the religious nature of the Ten Commandments since the other items in the display emphasize the secular legal and historical nature of the Commandments. It would be a mistake for a reasonable observer to conclude that the display sends the message of government endorsement of religion. Thus, it would be patently unreasonable to conclude that the display at bar reflects an *"unmistakable message"* of government support or endorsement of religion.[7]

7. As further support for the proposition that religious objects or texts may be used by

As indicated from *Allegheny*, if the display as constituted contained a sign indicating "sponsored by Harrodsburg Baptist Church," or the like, this would also impermissibly emphasize the religious nature of the Commandments. Here, however, the chosen context reasonably emphasizes the secular nature of the Commandments and not the religious. As explained in *Rutherford*, the display certainly could include other items which would perhaps better emphasize that the intent was not religious in nature. For example, the display could have included various quotes from historic lawgivers. However, as presently constituted, it cannot be said that the plaintiffs have a likelihood of showing that the display reflects an "unmistakable message" of government support or endorsement of religion.[8] Three Supreme Court Justices are recently on record addressing the effect prong of the *Lemon* test in the context of a Commandments display in a government building setting. According to Chief Justice Rehnquist, Justice Scalia and Justice Thomas, a Ten Commandments display in an historical, secular setting, even immediately outside a municipal building housing local courts and local prosecutor's offices, would likely not send an "unmistakable message" of government support for, or endorsement of, religion. *City of Elkhart v. Books*, 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001), *cert. denied* (Rehnquist, C.J., dissenting).

Importantly, in the context of Establishment Clause challenges, the reasonable observer of a Ten Commandments display should not be an eggshell or hypersensitive plaintiff. *Washegesic*, 33 F.3d 679, 684–85 (Guy, J., concurring). "The objective observer standard parallels the reasonable-person standard in torts law; the question is not whether one particular, un-

---

government in the secular sense without offending the Constitution, one need only look to the Sixth Circuit's last word on the Establishment Clause, in an *en banc* opinion. The Ten Commandments, as biblical text, "has become a moral as well as religious resource of insights in our Western culture." *Capitol Square* 243 F.3d at 305. "The Bible is literally quoted in all sorts of contexts that are not explicitly religious." *Id.* Thus, that particular text is found in the Bible "does not mean the phrase is advocating a particular religious institution." *Id.* As phrased by the Tenth Circuit, "[w]e know that [t]he Government may depict objects with a spiritual content, but it may not promote or give its stamp of approval to such spiritual content." *Anderson*, 475 F.2d at 32 (citing *Allen v. Hickel*, 424 F.2d at 948).

8. The plaintiffs at oral argument, in contradiction to portions of their brief taking a more hard-line stance, apparently concede in vague terms that a "neutral" display containing the Ten Commandments would pass constitutional muster. However, it would be highly impracticable, if not virtually impossible, to construct a display representative of all religions bearing some influence on this Country. Obviously, there is no requirement that a display include a "diversity of religious symbols" to pass constitutional muster. *Lynch* involved only one religious symbol, the Christian creche; whereas, *Allegheny* involved only one religious symbol, the Jewish menorah. In fact, other symbols with religious significance added to this display could actually promote, rather than dilute, any perceived reasonable endorsement of religion.

Similarly, the law does not dictate in absolutist terms a particular context by which a government may minimize any fairly perceived endorsement of religion. Instead, the analysis is fact-specific. Thus, the law does not categorically require a "comprehensive" historical display, purporting to represent a cross section of all historical influences on our laws in order for a display containing the Ten Commandments along with other secular documents to be constitutional. *See, e.g., Books v. City of Elkhart*, 235 F.3d at 318 n. 5 (Manion, J., concurring in part and dissenting in part). Further, for this Court to require Mercer County to acknowledge the historical influence of particular codes having dubious historical influence, relatively speaking, would be an intellectually dishonest way to comply with the endorsement test.

informed, subjective observer would view the display as an endorsement of religion but whether an objective, reasonable, knowledgeable observer would do so." *McCreary*, 96 F.Supp.2d at 686. The plaintiffs' argument incorrectly presumes that the reasonable observer is one who wants to rid government and the public square of any and all reference to religion. This is not the law. Instead, "there is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch*, 465 U.S. at 674, 104 S.Ct. 1355 (1984). In the Establishment Clause context, "[t]he line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers." *Abington*, 374 U.S. 203, 294, 83 S.Ct. 1560, 10 L.Ed.2d 844 (Brennan, J., concurring). As explained by the Sixth Circuit:

> If our history demonstrates anything, it demonstrates that the people of the United States did not adopt the Bill of Rights in order to strip the public square of every last shred of public piety. The notion that the First Amendment commands a brooding and pervasive devotion to the secular ... is a notion that simply perverts our history.

*Capitol Square*, 243 F.3d at 296.

A recent opinion from a federal district court in Utah nicely summarizes how history recognizes the secular influence of the Commandments and that the religious nature of the Commandments does not automatically overshadow the secular:

> We would take a myopic view of history if we denied that our laws did not have early roots with an origin which some believed divine. The fact that various versions of the "Ten Commandments" are thought by some to be of divine origin ought not to deprive those who place emphasis on its secular origins

[including Mercer County] of a chance to have their say. Religious groups do not have an exclusive claim to that code of conduct. It belongs to us all.

*Summum v. City of Ogden*, 152 F.Supp.2d at 1297, *aff'd* in part, *rev'd* in part, 297 F.3d 995 (10th Cir.2002).

The plaintiffs are certainly free to lobby their local governments to display symbols other than the Ten Commandments having a dual secular and religious nature, or to display symbols having solely secular import. Likewise, the plaintiffs are free to attempt to persuade citizens and local governments that a display emphasizing the secular, historical influence of the Ten Commandments is inappropriate as a matter of policy due to the fact that some in our pluralistic society are offended by the religious nature of the Commandments.

However, the fact remains that the Ten Commandments are not the exclusive province of religious groups or those who happen to believe in the truth of the individual Commandments. The posting of the Commandments in this context are not reasonably likely to be perceived as the disapproval of plaintiffs' individual religious choices. In reality, the plaintiffs are seeking the Court to endorse their philosophical or aesthetic preference for the extra constitutional, rigid view of the establishment clause that demands absolute separation between government and things with a dual religious and secular nature. Instead, the Constitution, the Supreme Court and the Sixth Circuit require accommodation, not hostility, towards religion. As emphasized recently by the Sixth Circuit, "[t]he mere fact that something done by the government may offend us philosophically or aesthetically does not mean, *ipso facto*, that the Constitution is offended." *ACLU of Ohio v. Capitol Square*, 243 F.3d at 309. Whether the relative benefits of a display acknowledging the historical,

secular influence of the Ten Commandments outweigh the sincere objections of citizens who are personally offended by such a display, in this context, is a matter entrusted to the judgment of local citizens and their elected representatives.

### 3. The strict scrutiny test for a denominational preference by the government does not apply

The plaintiffs allege that the defendants have chosen a sectarian version of the Ten Commandments for the display and that these explicitly discriminatory acts trigger the strict scrutiny test of *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). In that case, the Court invalidated a state statute that imposed registration and reporting requirements only upon religious organizations which solicited more than 50% of their funds from nonmembers. *Id.*

The Court relies on the Supreme Court's decision in *Lynch* in which a similar argument was rejected. In *Lynch,* the plaintiffs argued that a city's ownership and display of a creche discriminated between Christian and other religions and thus required strict scrutiny. Chief Justice Burger rejected this argument for the Court by stating: "But we are unable to see this display, or any part of it, as explicitly discriminatory in the sense contemplated by *Larson." Lynch,* 465 U.S. at 687, n. 13, 104 S.Ct. 1355.

Moreover, the Court is not in a position to decide whether the version displayed by the defendant complies with any sect's particular chosen version of the Commandments. There is no evidence before the Court that the version of the decalogue displayed by Mercer County is identifiable with any particular religious sect or denomination.[9] The mere fact that the posted version may be more like a traditional

Protestant version than the Catholic or Jewish versions does not mean that the posting of the Commandments favors one denomination or one religion over another. *See, e.g., Baker v. Adams Co. Sch. Bd.,* Case No. C–I–99–94 p. 12 (S.D.Oh.) (June 11, 2002). Further, such an independent determination of "which denomination's version is posted" would involve the Court in theological distinctions that are not the proper business of the Court. More importantly, a dispute over whether the chosen wording complies with a particular sect's version is the kind of subtle distinction the reasonable observer of the Commandments displayed in the secular sense would not make. *See Capitol Square,* 243 F.3d at 302. Therefore, the strict scrutiny standard of *Larson* does not apply to the facts at bar.

Based upon all the above, the plaintiffs are unable to establish a strong or substantial likelihood of success on the merits of either prong one or prong two of the *Lemon* test. Therefore, the plaintiffs have not demonstrated that they are likely to prevail on the merits and judgment shall be entered in favor of Mercer County on the motion for preliminary injunction.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. SUMMARY JUDGMENT STANDARD

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

---

9. Unlike in *Berry,* the plaintiffs have failed to present testimony, affidavits or other evidence

indicating that the displayed Commandments represent a denominational preference.

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies,* 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

### B. ANALYSIS

The Supreme Court has indicated that courts "not only can, but must, include an examination of the circumstances surrounding [the governmental] enactment." *Santa Fe Independent School Dist. v. Doe,* 530 U.S. 290, 315, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). Thus, the plaintiffs are entitled to a reasonable time in which to conduct limited discovery in an attempt to prove to the Court that Mercer County's stated secular purpose for the display is a sham. The defendant's motion for summary judgment will be denied without prejudice, subject to being refiled after the limited discovery period.

The defendants' contention that the "cards are stacked against them" during this discovery is misplaced. As *Lynch* teaches, the government does not have to have an exclusively secular purpose for the display. The Court simply requires that the display not be "motivated *wholly* by religious considerations." *Lynch,* 465 U.S. at 680, 104 S.Ct. 1355

Both sides have been granted 120 days from August 22, 2002 in which to conduct discovery.

### CONCLUSION

Accordingly, the Court, being fully advised, hereby ORDERS that

(1) Plaintiffs' motion for preliminary injunction [DE # 2] is DENIED;

(2) Defendants' motion for summary judgment [DE # 6] is DENIED without prejudice;

(3) The parties are granted 120 days from August 22, 2002, in which to conduct discovery.

This ⸺⸺⸺ day of September, 2002.